MICHELLE R. BURROWS P.C.
Michelle R. Burrows
420 SW 4th St. Ste. 300
Portland OR 97140
503/241-1955
Michelle.r.burrows@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | | |
|---|---|---|
| JOHN RAINS, | ) | |
| | ) | No. |
| Plaintiff | ) | COMPLAINT |
| | ) | (Civil Rights: 8th/14th Amendment |
| v. | ) | Delay/Denial Essential Medical care) |
| | ) | |
| DR. EDWARDS, DR. BUCKLER | ) | |
| CINDY WADSWORTH, A. | ) | |
| ERIKSSON, DR. ADAMS | ) | |
| REBECCA YAZY, DAN BERGER, | ) | |
| | ) | |
| Defendants. | ) | |

INTRODUCTION

Plaintiff, John Rains, was at all times incarcerated at the McLaren Youth Facility where he was prescribed over nine different medications for anxiety and depression. The medications were not necessary and eventually led to toxic levels resulting in Systemic Inflammatory Syndrome or Steven's Johnson's syndrome. Despite knowing the medications were likely the cause of increasingly worsening symptoms the named defendants failed to discontinue the medications and failed to adequately treat the symptoms and delayed seeking expert care for Plaintiff who nearly died as a result of the delay and denial of proper medical care by the named defendants.

PARTIES

1.

Plaintiff, John Rains, has been at all material times a resident at the McLaren Youth Facility in

Woodburn Oregon. He has been a resident at McLaren since he was 15 and is now 20 years old.

He is scheduled to be released in 2015.

2.

A. Erikson is a nurse practitioner employed by the State of Oregon and treats patients at the

McLaren Youth Facility. Defendant Erikssonwas one of the primary care providers responsible

for the care of Plaintiff John Rains.

3.

Dr. Buckler is a psychiatrist employed by the State of Oregon and treats patients at the McLaren

Youth Facility. Dr. Buckler treated Plaintiff for certain psychological disorders.

4.

Dr. Edwards is a physician employed by the State of Oregon and treats patients at the McLaren

Youth Facility. Dr. Edwards was one of the primary care physicians responsible for the care of

Plaintiff.

5.

Dr. Adams was at all times relevant the Medical Director for the Oregon Youth Authority which

manages McLaren. She was personal involvement in certain medical decisions for Plaintiff.

6.

Ms. Cindy Wadsworth was at all times relevant the nurse supervisor responsible for the care of

Plaintiff .

7.

At all times Rebecca Yazy was an employee of the State of Oregon and was involved in medical decisions for Plaintiff.

8.

At all times Dan Berger was an employee of the State of Oregon and was involved in the medical decisions and care for Plaintiff.

PROCEDURAL ALLEGATIONS

9.

Plaintiff files this action under 42 U.S.C. §1983 and 42 U.S.C. 10010, for events occurring on or between October 18, 2013 and  August 1, 2014 in violation of the 8th and 14th amendments to the United States Constitution for delay and denial of essential medical care, failure to provide adequate and timely medical care.

10.

This court has jurisdiction over Plaintiff's claims of violations of federal constitutional rights under 28 U.S.C. § 1331 and 1343.

11.

Venue is proper under 28 U.S.C. §1391(b), in that one or more of the defendants reside in the District of Oregon and Plaintiff's claims for relief arose in this district.

12.

The court has jurisdiction over Plaintiff's pendent state law claims under 28 U.S.C § 1367.

13.

Plaintiff is entitled to his attorney fees and costs as a prevailing party pursuant to 42 U.S.C, 1988.

GENERAL ALLEGATIONS

14.

Plaintiff John Rains was committed to the custody of the Oregon Youth Authority when he was 15 years old and a Freshman in high school. He was sentenced to serve until 2015 in the custody of the Oregon Youth Authority at the  McLaren Youth Facility in Woodburn Oregon. He was 20 years old and incarcerated at McLaren during most of the matters alleged herein.

15.

In October and November 2013 Mr. Rains reported feeling anxiety, depression and sleeplessness. He reportedly was hearing voices and experiencing mood swings. He was seen by Dr. Ericksson and Dr. Buckley. Dr. Buckley prescribed the first of what would eventually total over 14 different medications aimed at treating depression, anxiety and sleeplessness. Three different providers prescribed the various medications in fluctuating doses over the course of 11 months. The medical records do not provide a complete or accurate record of what medications and in what dosage Mr. Rains was receiving. Many of the medications were administered simultaneously by different physicians.

16.

Between October 2013 and August 2014 Mr. Rains was prescribed and received the following non-exhaustive list of drugs: Phenergan, Lexapro, Haldol, clonazepam, Saphris, Thrombocytopenia, hydroxyzine, diphenhydramine, escitalopram, lorazepam, olanzapine Zydis, Quetiaprone, promethazine, beadryl, trazodone, zopan. It appears from the records no regular record of Plaintiff blood pressure, or other vitals was regularly kept and no regular blood work was done to monitor the effect, if any, of the various drugs.

17.

On February 25, 2014 Plaintiff's dosage of Seroquel was increased as was his hydroxyzine. The Seroquel replaced resperadal which was discontinued in January 2014.

18.

On or about March 3 and 4, 2014 Plaintiff was seen pacing and was observed to have a "flat affect". He denied having hallucinations. On March 4, 2014 he was prescribed Zyprexa in addition to the other medications he was taking. Defendant A Eriksson order a psych evaluation based on the observations which were reported to him.

18.

On March 7-8, 2014 Plaintiff was seen by Dr. Buckler who noted Plaintiff had trouble sleeping. Plaintiff had been seeing the psychiatrist throughout January and February 2014. On March 12, 2014 the defendant physicians increased Plaintiff dosage of propromotal and zypreza. The Zyprexa was increased again on March 15 and the carbamozopine was increased to 200mg.

19.

In early March 2014 from approximately March 15 through the 17th Plaintiff reported to medical staff that he was "feeling odd" and that his skin had been "tingling" for months. In a written observation from Dr. Buckler it was noted that the "youth was on several psych meds and that it was suspected a "possible adverse reaction to medication". Dr. Buckler only discontinued promethazine at that time. He did not reduce any other medication and it appears did not order any blood panels.

20.

Plaintiff had no psychotic episodes prior to his placement in McLaren and only reported situational depression and sleeplessness. He had no reported psychotic outbursts or suicidal expressions.

21.

On March 18, 2014 Mr. Rains reported to the infirmary because he did not feel well. The chart notes he had a "guarded" posture, poor appetite and felt unwell. No provider reduced any of the medications nor does it appear any blood work was ordered.

22.

On March 21, 2014 Plaintiff developed a rash on his face and stomach. The medical providers observed the new and unexplained rash observing that Mr. Rains was a "risk for allergic response". No provider discontinued any medication but instead added Benadryl. All other medications were continued unchanged.

23.

On March 23, 2014 Plaintiff had a visit with his grandmother who observed that the rash had spread to Mr. Rains hands and he had a headache and a fever. He reported to his grandmother he did not feel well. Mr.Rains grandmother reported all of her observations to John's mother, April Rains, who called John at his cottage at McLaren. He reported that he was tired and slept all day.

24.

By March 22, 2014 the chart notes that the rash was spreading, that it was itching and now it consisted of raised lesions on the arms. He was observed to have a swollen lymph node on the lateral side of his neck. Dr Buckler discontinued phenorgan and ordered lab work for the first time. Ms. Wadsworth was notified of these symptoms but no order to transport Mr. Rains to the hospital was made; and, in fact, it appears Ms. Wadsworth refused to issue such an order.

25.

On March 24, 2014 the infirmary staff at McLaren called April Rains and informed her that John was in the infirmary being "monitored" and he had a reported temperature of 103. In fact Plaintiff continuously ran an elevated temperature the entire time he was in the infirmary.

26.

By March 24, 2014 John reported aches, chills, and his symptoms were worsening. He was not taken to the hospital. No further medications were discontinued but Tylenol was added to combat the fever. The chart notes Ms. Wadsworth and other nurses reported that Mr. Rains had the flu and would fully recover. There is no mention in the chart at this time of the possibility of toxic levels of medication or adverse reactions to high doses and combinations of medications.

27.

On March 24, 2014 Dr. Edwards and Dr. Buckler ordered forced fluid diet and rest. They also ordered more lab work. Mr. Rains was not transported to the hospital and it appears no other medications were discontinued.

28.

On March 26, 2014 John's parents visited him at the infirmary. Mrs. Rains requested the nurse transport John to the hospital immediately. Dr. Edwards refused, noting that this was probably a virus and would resolve with time. Dr. Edwards told Mr. Shawn Rains "you don't know if it's a rose until it blooms" in response to their concerns. Mrs. Rains spoke with several other medical providers, offered to pay for the transport and finally John was transported to Legacy Meridian Park on March 26. The transport only occurred after Shawn Rains spoke to Mr. Abe Rios, assistant to Dan Berger, who in turn convinced Dr. Edwards to transport. Dr. Edwards called ahead and advised the ER staff that Mrs. Rains was overly protective. The emergency room

doctor noted that the McLaren records were horrible at best because they had not been charting his vitals, his urine, bowel movements or temperature.

29.

After running some tests the ER doctor concluded this was a virus and John was returned to McLaren. It is not known whether John's medication flow chart was provided to the hospital.

30.

On March 25 Mrs. Rains called Dr. Adams, the Medical Director, for OYA and repeated their concerns about their son's condition. Dr. Adams opined it could be a medication allergy. She advised the Rains she would call both Dr. Edwards and Dr. Buckler to make inquiries about whether or not removing John from his medications would be appropriate.

31.

On March 25 Mrs. Rains once again contacted the McLaren infirmary. She was advised John still was running a fever but was being administered ibuprofen . Mrs. Rains indicated to the staff that she was worried because John had been running a fever for nearly five days with no improvement. After speaking with her son, Mrs. Rains agreed that removing her son from all his medication would be the best course. The doctors had not discontinued John's medications and tried to administer them but John refused. Dr. Adams called back and reported that Dr. Edwards disagreed with removing John from any of his medication.

32.

On March 26 John's rash was turning purple. John reported feeling weak and still suffering a fever. The nurses were calling John "barney" because of his purple color with absolutely no concern about the ongoing fever and increasingly worse symptoms.

33.

Between March 25 and the 28th the medical chart is very vague but there are notes about Mrs. Rains' telephone calls. On March 25 the rash on John had spread to his leg and feet. His entire body was purple and he was nearly unrecognizable because he was so swollen. He had a fever and was experiencing diarrhea and vomiting. John reported he felt as if he were burning up. Mrs. Rains demanded to speak with Dr. Adams. At this time lab work indicated John's liver function tests were elevated.

34.

On March 30 Mr. and Mrs. Rains visited John in the infirmary. They requested John be taken to the hospital again because he was obviously worse in the four days since they last saw him. John Rains was vomiting more frequently, had diarrhea and was feverish. The rash had spread to John's entire body and his was more swollen. The nurses told the Rains they had not taken John's temperature that day at all. The nurses also admitted they were not tracking the urine John was discharging and could not advise how much fluid he was losing or whether he was dehydrated. John Rains was also having a difficult time breathing.

35.

One nurse reported she had asked Dr. Adams for consent to transport John to the hospital, but could not reach Dr. Adams. Mrs. Rains attempted to reach Dan Berger, the superintendent, but he was on vacation. She was placed in contact with Ms. Rebecca Yazzi. Mrs. Rains explained the entire situation to Ms. Yazzi noting that her son was getting worse and needed to be taken to the hospital. Ms. Yazzi who has no medical training said that she supported "the infirmary" opinion that this was still "just a virus".

36.

Ms. Rains left messages for Dr. Adams and Mr. Berger explaining the worsening situation and was told by Ms. Yazzi in a second call who reported that Dr. Adams said this was not urgent and "could wait". The Rains were told by staff that they had to leave . One nurse, "Cindy" told them she had been called in from church because the Rains were making such a "stink". She told them John was fine and in "good spirits".

37.

Mrs. Rains continued to advocate for her son and engaged in a conversation with several nurses including one only identified as "Edie". Edie told Ms. Rains that she had seen "this before" and became irritated with Mrs. Rains. Mrs. Rains asked Edie and other nurses if they had taken John's temperature or his vitals. They had not. She asked Edie and the nurses if John might be dehydrated because he was not only running a fever but was throwing up. Edie replied that John was "fine" and refused to take any further action. John was having a difficult time breathing.

38.

Mrs. Rains left McLaren on March 30 and sent a detailed email to Dan Berger advising him of the situation. No one connected Mrs. Rains with any doctor and none of the nurses on duty that evening appeared to be concerned with John's worsening condition. Debbie Crabtreee returned from vacation and after examining John called the ambulance to transport him to the hospital. Almost none of these last days of treatment are documented in the chart.

39.

John was diagnosed with Stevens-Johnsons syndrome which is a deadly life threatening reaction to medication. By this time the doctors at McLaren were prescribing numerous medications and continually changing the dosage often in the span of days. None of the medication charts were

kept current and it was difficult to ascertain what medications were being administered on any

given day.

40.

John was immediately admitted to the Intensive Care Unit where he was treated with high

dosage of prednisone, antibiotics and fluids. He had a fever of 104.1, dangerously low blood

pressure, low oxygen level and a rapid resting pulse of 145. His respirations continued to

decrease and he was given a differential diagnosis of DRESS and/or Stevens Johnson syndrome.

John Rains was intubated because of lung fluid and remained on a respirator for several days. He

was experiencing severe liver and kidney failure. The Rains were told their son might die.

41.

Over the course of his illness John Rains lost over 30 pounds and may have suffered permanent

kidney damage which will likely not be fully understood for some time.

42.

John Rains remained in the hospital for 14 days and was returned to the Youth Facility. He had

one more flare up necessitating another hospitalization and was treated with prednisone for

another flare up in the facility.

43.

Stevens-Johnson Syndrome or SJS is a rare skin condition that has resulted in over 5000

hospitalizations each year. It is characterized by painful lesions and burns developing across

much of the body. SJS may develop into toxic epidermal necrolysis (TEN) in which the

epidermis separate from the dermis. Both conditions can be fatal and may cause blindness and

permanent disability.

44.

SJS survivors report that SJS literally "burn from the inside out". Short term symptoms include rash, fever blisters and skin lesions. Long term symptoms may include permanent blindness, scarring, lung damage, pulmonary disease, brain damage, genital injuries, peripheral neuropathy, sterilization, esophageal strictures, arthritis and death.

45.

SJS is a disorder of the skin and membranes and is most often a reaction to medication or an infection. Often SJS begins with flu-like symptoms followed by a painful red or purplish rash that spreads and blisters. Then the top two layers of the affected skin dies and sheds.

46.

Recovery from SJS can take weeks to months, depending on the severity of the condition. The manifestations occur within 2-6 weeks of ingestion of the drug. SJS also manifests with the presence of fever and malaise. Lesions generally start on the trunk and are tender.

47.

The most common causative drugs of SJS are antibiotics, anticonvulsants were the second most common, NSAIDS are third. Drugs which have been identified as causative agents of SJS cover a range of over 200 drugs. Various scientific studies have made available the full list of drugs associated with Steven Johnson syndrome and include, without limitation: Dilantin, lamictal or lamictal XR, Zithromax, Avelox, Cipro, Motrin, Acetaminophen, Aldactone, Aldactizide, Advil, Alopurinal/Zyloprim, Arthrotec, Azithromycin, Azulfadine, Celbrex, Cerebyx, Cleocin/Clindamycin, Diflofenac, Difluan, Factive, Flector Patch, Fentanyl, Flagyl, Ibuprofen, Levaquin, Montelukast, Naproxen, Norvasc, onfi, Phytoin, Piroxicam, Tamflyu, Tylenol and Zarontin.

48.

John Rains also received a differential diagnosis at the hospital of DRESS or Drug Rash with

eosinophilia and dsystemic symptoms, is also a severe drug reaction. SJS and DRESS are similar

but have differing pathogenesis and clinical features. Both are triggered by reactions to

medications.

49.

The most common produral symptom of DRESS is itching, fever and malaise. The liver is

frequently compromised in DRESS. The mucosal membrane of the oral cavity and eyes are often

affected in SJS.

50.

In addition to rash DRESS is also characterized by fever, lymph-node enlargement and internal

organ involvement. The differential diagnosis of DRESS is SJS. DRESS and SJS ae similar in

that the clinical manifestations typically occur within 2-6 weeks after initiating drug therapy.

51.

The diagnosis of DRESS or SJS is based on the presence of a relationship between drug intake

and the time to cutaneous adverse reactions. The diagnosis of DRESS is based on the existence

of associated systemic involvement and the presence of eosinophilia. Eosinophilia  is a higher

than normal level of eosinophils. Eosinophils are a type of disease-fighting white blood cell.

52.

High levels of eosinophils may be detected in the blood (blood eosinophilia). High levels of

eosinophils may also occur in the body's tissues at the site of an infection or inflammation (tissue

eosinophilia). Tissue eosinophilia may be found in samples taken during an exploratory

procedure or in samples of certain fluids, such as mucus released from nasal tissues. If tissue

eosinophilia is presented, the level of eosinophils in the bloodstream is likely normal. Blood

eosinophilia may be detected with a blood test, usually as part of a complete blood count. A

count of more than 500 eosinophils per microliter of blood is generally considered eosinophilia

in adults.

53.

The diagnosis of SJS is based on severe skin lesions. DRESS and SJS are differentiated by the

nature of the skin lesions and extent of body surface area involvement over other criteria.

54.

Patients with DRESS syndrome typically have prodromal symptoms of itching, fever and facial

edema. Patients with SJS commonly present with prodromal symptoms of fever and malaise. The

first skin lesions appear on the extremities and face in DRESS and on the trunk in SJS.

55.

Both syndromes successful recovery is dependent upon cessation of the causative drugs. Both

syndromes are typically treated with corticosteroids with DRESS normally showing dramatic

improvement.

56.

John Rains was first admitted to Legacy Meridian Park Hospital with suspected DRESS

syndrome. The doctor at Meridian Park felt the patient was nearing the end of a possible

SJS/TEN vs. DRESS reaction and stopped antibiotics and steroids  on April 3. By April 4 John

Rains had recurrent fevers and was restarted on medication.

57.

Between April 4 and April 11, 2014 Mr. Rains medical condition declined significantly. He

developed bilateral pulmonary infiltrates (filling of the lungs) and progressed to hypoxic

respiratory failure and then ARDS (Acute Respiratory Distress disease) requiring intubation on April 5, 2014 and was extubated on April 8, 2014.

58.

Acute respiratory distress syndrome (ARDS) occurs when fluid builds up in the tiny, elastic air sacs (alveoli) in the lungs. More fluid in the lungs means less oxygen can reach the bloodstream. This deprives the organs of the oxygen they need to function.  ARDS typically occurs in people who are already critically ill or who have significant injuries. Severe shortness of breath — the main symptom of ARDS — usually develops within a few hours to a few days after the original disease or trauma.  Many people who develop ARDS do not survive. The risk of death increases with age and severity of illness. Of the people who do survive ARDS, some recover completely while others experience lasting damage to their lungs.

59.

In addition, by April 8, 2014 Mr. Rains developed DIC (Disseminated intravascular coagulation) characterized by systemic activation of blood coagulation, which results in generation and deposition of fibrin, leading to microvascular thrombi in various organs and contributing to multiple organ dysfunction syndrome (MODS). Consumption and subsequent exhaustion of coagulation proteins and platelets (from ongoing activation of coagulation) may induce severe bleeding, though microclot formation may occur in the absence of severe clotting factor depletion and bleeding. Derangement of the fibrinolytic system further contributes to intravascular clot formation, but in some cases, accelerated fibrinolysis may cause severe bleeding. Hence, a patient with disseminated intravascular coagulation (DIC) can present with a simultaneously occurring thrombotic and bleeding problem, which obviously complicates the proper treatment. DIC is estimated to be present in as many as 1% of hospitalized patients. DIC

is not itself a specific illness; rather, it is a complication or an effect of the progression of other

illnesses. It is always secondary to an underlying disorder and is associated with a number of

clinical conditions, generally involving activation of systemic inflammation.

60.

As a result of his various system failures during intubation there was an unsuccessful NGT

placement attempt resulting in severe nasal bleeding requiring bilateral rhino rockets to be

inserted by the ENT and Mr. Rains was prophylatically placed on Unasyn for TSS (Toxic Shock

Syndrome).

61.

Mr. Rains also developed acute hepatitis as a manifestation of his DRESS syndrome.

62.

Mr. Rains underwent a skin biopsy by dermatology showing Spongiotic dermatitis (A generic

term for a broadly defined histopathologic pattern characterized by "eczema", often associated with an

increase in eosinophils occurring in a background of contact dermatitis, atopy and drug reactions)  with

superficial perivascular chronic inflammation (skin rashes caused by medication) and scatter

dermal eosinophils without epidermal necrosis—features more compatible with a DRESS

diagnosis.

63.

Mr. Rains also had persistent orthostatic hypotension (low blood pressure) resulting in a

syncopal (fainting) event on April 11, 2014.

64.

During his hospitalization Mr. Rains experienced acute respiratory failure, acute and subacute

necrosis of the liver, defibrination syndrome (bleeding), eosinophilia, systemic inflammatory

response syndrome due to non-infectious process without acute organ dysfunction, dermatitis due to drugs and medicines taken internally.

65.

At his discharge from the hospital on April 15, 2014 his problem list was described as follows:

1. Skin rash resolved by April 20

2. Elevated liver function tests still present

3. Drug toxicity

4. Fever

5. Leukocytosis

6. Anxiety

7. DRESS syndrome

8. PTSD

9. Anemia present 4/6/14

10. Syncope present 4/11

11. Orthostatis hypotension present 4/13

12. Resolves SIRS (systemic inflammatory response syndrome)

13. Resolved Acute respiratory failure

14. Resolved DIC

15. Resolved: Thrombocytopenia

66.

The hospital also determined John Rains was allergic to Seroquel (Quetiapine) which likely caused the SJS/TEN syndrome and Tegrtol (Carbamazepine) also indicative of the SJS/TEN

syndrome. Furthermore, the hospital discharged John with instructions to stop taking altogether the following list of drugs he had received at McLaren: Carbamazepin (Carbatrol), escitalopram oxalate (lexapro), hydroxyzine (vistaril), ibuprofen (advil/motrin), olanzapine zydis (Zyprexa), propranolol (Zyprexa), quetiapine (Seroquel), Quetiapin (Seroquel), slow release iron.

67.

John Rains was sent back to McLaren where it took him several months to gain his normal coloring, appetite and energy. He reports difficulty breathing and feeling tired. It is unknown whether there is permanent lung, liver or kidney damage. It is also unknown whether there is any permanent damage to John's mental abilities as a result of the toxic drug dosage, the high fever and the various other medical problems which ensued all because of the actions of defendants.

68.

John Rains suffered severe pain and suffering as a result of the medical consequences of the intentional and deliberate overdosing by Defendants Edwards, Buckler, Erickson and Adams. Despite their awareness as early as early March of potential drug toxicity none of these medically trained individuals stopped any of the drugs nor attempted to further assess the growing symptoms. As a result John Rains nearly died.

69.

John Rains continues to suffer from medical aftereffect of the events described herein. He has breathing problems, his skin is sensitive and subject to outbreaks, he is still not fully recovered from the effects of the over medication. He has suffered significant and severe emotional damage as a result of all of these events. He may likely have further medical care required in the future as a result of the care and treatment by these defendants. Those economic damages cannot be fully assessed at this time.

**FIRST CLAIM FOR RELIEF**: Failure to provide timely and adequate mental health care
8th/14th Amendment
Defendants Edwards, Eriksson and Buckler

70.

Plaintiff realleges all the matters previously alleged in this complaint as if more fully set forth.

71.

Plaintiff is entitled to be free from cruel and unusual punishment pursuant to the 8th and 14th Amendments of the United States Constitution. This protection includes a right to adequate and timely medical care. Failure to provide adequate medical care amounts to deliberate indifference to a prisoner's wellbeing and constitutes cruel and unusual punishment in violation of the 8th Amendment. Recklessness with respect to the required standard of care can constitute "deliberate indifference" to a prisoner's medical needs under the 8th Amendment. In this case, Defendants acted with deliberate indifference in failing to timely and adequately respond to Plaintiff's serious medical needs.

72.

Plaintiff was a minor when the defendants began to treat him for depression and depression associated symptoms. Mr. Rains was entitled to a higher degree of care as a minor.

73.

The medical charting of McLaren is unnecessarily vague and rarely contains all the information necessary to document the medical care being provided. The chart for Mr. Rains does not contain all the ongoing monitoring necessary when administering highly toxic and dangerous drugs to young adults and children. The doctors appear to prescribe various medications without charting the efficacy or responsiveness to those drugs by the patient.

74.

In this case Mr. Rains presented with symptoms of anxiety and depression associated with being a child who is incarcerated and then having to address the underlying crimes for which he was

incarcerated. This patient was entitled to a full psychological work up and monitoring for any drugs being prescribed. The patient was entitled to be monitored closely for the effects of the medications. When the patient became an adult he was entitled to a full explanation of the drugs and their side effects and given the choice to continue or refuse those drugs. Mr. Rains was never given an informed consent discussion which is noted in the chart.

75.

As noted above the various medical providers began to prescribe various medications to Mr. Rains for what was a manageable anxiety/depressive disorder associated with his incarceration. He was not regularly monitored for the side effects of one drug let alone the dangerous and significant combinations of drugs he received. The chart is inadequate for documenting who was monitoring his drugs, the dosage nor was there any medical plan to remove John Rains from his medications when he no longer needed them.

76.

Defendants Buckler, Edwards and Erickson violated John Rains 8th/14[th] Amendment protections in the following ways:

1.  They failed to adequately document the need for each medication they prescribed for the alleged mental health issues;

2.  They each failed to adequately document the various signs/symptoms of mental health issues which justified the medications they administered;

3.  They each failed to adequately monitor the use of the medication and the side effects of each;

4.  They each failed to advise John Rains of the potential side effects and allow him to determine whether he wanted to continue;

5.  They each failed to monitor the totality of medications being administered to John Rains and to insure they were not provided lethal doses;

6. They failed to adequately chart the resulting side effects and reduce or discontinue the drugs when John Rains reported problems.

7. They each failed to discontinue drugs when they each suspected John Rains was suffering from a toxic reaction to his medications;

8. They each administered so many medications it was impossible to note which medication was causing the allergic and toxic reactions;

9. They each failed to properly supervise the various nurses who should have been aware of toxic reactions to medication and adequately document and note the worsening symptoms;

10. They each failed to stop medication even when John Rains symptoms clearly indicated toxic reaction to medication;

11. They each failed to note or treat the increasingly worsening symptoms indicative of DRESS or SJS.

12. They each failed to establish a differential diagnosis for the symptoms experienced by John Rains which would lead a reasonable practitioner to conclude that toxic reaction was occurring.

13. All of these failures and omissions resulted in a dangerous delay in proper treatment for both the underlying depression, the adverse response to the medications and the onset of AJS and DRESS.

SECOND CLAIM FOR RELIEF: Failure to provide timely and adequate care for toxic reaction to drugs
8th/14th Amendment
Defendants Edwards, Eriksson, Buckler, Adams, Yazy, Berger, Wadsworth and Nurse Does

77.

Plaintiff realleges all matters previously alleged as if more fully set forth.

78.

Each and every defendant named herein participated in medical decisions concerning the events between March 1 and May 1, 2014 in the delivery of health care to John Rains. Each and every one of the medical providers failed to take adequate steps to ascertain the nature and extent of John Rains medical situation.

79.

The defendant delayed and denied medical care in the following manner:

1. The medical doctors prescribed medications which were likely not necessary and were administered without monitoring or attention to the dosage.

2. The medical doctors failed to order labs or evaluation of the effect of the combination and quantity of medication on John Rains;

3. When the medical providers, specifically the defendant doctors, became concerned about medication toxicity and allergic reaction, they never discontinued any medication;

4. When John Rains began to manifest symptoms of a possible toxic reaction to medication no medical doctor began to explore a differential diagnosis and simply determined the condition was a virus.

5. The defendant ignored the increasingly worsening symptoms which were indicative of SJS and DRESS and at some point were no longer indicative of a simple virus and as a result the doctors failed to take any action to provide John rains adequate and timely health care.

6. The defendant nurses simply ignored John Rains symptoms and failed to adequately chart and note the various increasingly worsening symptoms;

7. The defendant nurses and Ms. Wadsworth became personally antagonistic toward the Rains family as they tried to advocate for John Rains and allowed their own personal animus control the care of John Rains and as a result John Rains was given inappropriate medication, his symptoms were ignored and not properly documented, he was not transported to a hospital nor was he seen by an adequately trained professional. The actions of the nurses caused more harm to John Rains

8. Defendants Yazy and Berger failed to intervene to require a transport to the hospital and Yazy practice medicine without any medical background.

### FOURTH CLAIM FOR RELIEF: Medical Negligence

#### 80.

Plaintiff realleges all the previous matters as if more fully set forth.

#### 81.

Oregon law normally requires the public employer to be held responsible for the negligent acts of their employees. In this instance the employer is the State of Oregon who cannot be sued in federal court absent consent. Oregon Statute however permits the naming and suing of individual state employees or those act under color of law to be named individual if the recovery available will not be adequate to fully compensate the plaintiff.

#### 82.

Each of the medical providers and state employees named herein took an active role in the medical negligence committed against John Rains. Each of the various failures by the defendants is noted above and Plaintiff incorporates those various failures herein.

#### 83.

The Defendants each have a special relationship with John Rains as he was incarcerated in a state youth facility. That special relationship imposes a higher duty of care between the defendants and the plaintiff.

84.

The defendants owed a duty of care to the plaintiff to provide medical care and treatment for his serious medical conditions. The actions of the defendants herein breached the duty they owed to John Rains and violated the special relationship between themselves and the plaintiff in such a way as it was foreseeable that the negligent acts would result in a serious allergic reaction, the development of DRESS or SJS and the inevitable medical results of those disorders which were untreated for a significantly long period of time.

85.

The negligence of each defendant caused the serious allergic reactions (DRESS and SJS), the resulting hospital related disorder including the respiratory failure, the bleeding disorder, the skin disorders, the organ failures and all future losses associated with those disorders.

86.

As a result of the negligence of the defendants John Rains may likely suffer from serious skin, breathing and bleeding disorders for his life. He may have suffered permanent and long lasting kidney and liver injuries. He suffered extreme pain and physical discomfort. John Rains economic damages are not known at this time but are no less than $500,000. His non-economic damages are also difficult to predict as he is only 20 years old but will be no less than 2,500,000 dollars.

WHEREFORE Plaintiff prays for judgment as follows:

1. For a judgment against each named defendant, joint and several for the violations of the 8th amendment for $3,000,000;

2. For a judgment against each defendant for their negligence of $3,000,000.

3. For attorney fees on the 1983 claims

4. For costs and disbursements allowed by law.

   Dated this 26th day of May 2015.

                                        Respectfully submitted,


                                        /s/Michelle R Burrows
                                        Michelle R. Burrows OSB86160
                                        Attorney for Plaintiff
                                        420 SW Washington St. Ste. 300
                                        Portland OR 97204
                                        503/241-1955